***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Jones and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence. Based upon such reconsideration, the denial of benefits by Deputy Commissioner Jones is reversed.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant-employer.
3. Sentry Insurance Company was the carrier on the risk.
4. On September 5, 2000, plaintiff suffered a compensable injury by accident arising out of and in the course of his employment with defendant-employer.
5. A Form 22 was submitted from which an average weekly wage may be determined.
6. Plaintiff's medical records were stipulated into evidence as Stipulated Exhibit 1.
7. Industrial Commission Forms and filings relating to this case were stipulated into evidence as Stipulated Exhibit 2.
8. Plaintiff's personnel file from defendant-employer was stipulated into evidence as Stipulated Exhibit 3.
9. Plaintiff's work log was stipulated into evidence as Stipulated Exhibit 4.
10. Plaintiff's payment stubs were stipulated into evidence as Stipulated Exhibit 5.
11. The issues before the Full Commission are: (i) whether plaintiff is entitled to temporary total disability from October 10, 2000, through December 18, 2000; (ii) whether plaintiff is entitled to wage loss after December 18, 2000, as result of his compensable injury; (iii) whether plaintiff is entitled to any compensation pursuant to N.C. Gen. Stat. § 97-30; (iv) whether plaintiff was terminated for misconduct unrelated to his compensable injury by accident; and (v) if plaintiff is entitled to further compensation, what compensation is due plaintiff?
 *********** EVIDENTIARY RULINGS
The objections raised in the depositions of W. Stephen Furr, M.D.; Michael J. Meighen, M.D.; Ranjan Shanti Roy, M.D.; Paul D. Schroll; and Timothy Stackie, D.C., are OVERRULED.
 ***********
Based upon all the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 32 years old and a high school graduate.
2. Plaintiff was employed by Carolina Crossing Marine from February 16, 2000, until October 10, 2000, as a marine technician, or boat mechanic. Plaintiff holds a certificate as a Merc Cruiser certified mechanic. Such certification requires specialized knowledge and skill.
3. The physical requirements of a boat mechanic are very strenuous. The lifting requirements of the job include the lifting of batteries weighing around 75 pounds and outboard motors weighing over 100 pounds. Approximately 20 to 25 percent of a boat mechanic's time is spent lifting. A mechanic must often be bent over when performing any maintenance or repair on watercraft. Plaintiff estimated he spent as much as 40% of his time working in a bent over position. Additionally, to perform his work, plaintiff had to get into many awkward positions.
4. On September 5, 2000, plaintiff and his co-workers were preparing for a boat show. He and his co-workers were carrying a roll of carpet when his co-workers dropped the end they were carrying. Plaintiff continued to hold his end of the carpet and all of its weight shifted to him. When this happened, plaintiff experienced severe pain in his lower back. Plaintiff reported the injury to the owner of Carolina Crossing, Tom Reimann, who referred plaintiff to a chiropractor he knew for treatment.
5. Plaintiff started treating with Dr. Timothy Stackis on September 7, 2000. Dr. Stackis treated plaintiff almost every weekday from September 7, 2000, until November 10, 2000. Dr. Stackis diagnosed plaintiff with "lumbosacral\radicular syndrome, sciatic neuritis, lumbar sprain\strain, and subluxation of the lumbar spine." Dr. Stackis placed plaintiff on restrictions for one month of no lifting greater than forty pounds; no excessive bending, twisting, jumping, or stooping; and, no repetitive flexion. From the first visit with Dr. Stackis, plaintiff exhibited radicular symptoms running down into his right leg. Dr. Stackis acknowledged that the presence of radicular symptoms could be a sign or symptom of a disc herniation.
6. Plaintiff would visit Dr. Stackis in the morning before reporting to work. This caused plaintiff to be late for work between the dates of September 7, 2000, to November 7, 2000. On September 13, 2000, plaintiff was written up for being late. Additionally, his job start time was changed from 8:30 a.m. to 8:00 a.m. On September 14, 2000, nine days after his injury, plaintiff received his end of thirty-day probation performance review. This review was performed four months after it was due. Plaintiff was criticized for being late and was given thirty days to improve.
7. On October 10, 2000, prior to the period he was given to improve, plaintiff was terminated. He was terminated, in part, for "excessive tardiness." Prior to his injury, plaintiff had never been given any warning concerning his tardiness and had never been disciplined. Carolina Crossing Marine's explanation that the timing of the 90-day review and its termination of plaintiff before the 30-day probationary period had ended were merely coincidental is not accepted as credible. The Full Commission finds that Carolina Crossing Marine's stated reasons for plaintiff's termination were pretext.
8. After plaintiff was terminated, he continued to have problems with his back. He went to his family physician on November 15, 2000. He was diagnosed with a low back strain with radiculopathy. Plaintiff's family physician placed him on a steroid dose pack. On the next visit, he was sent to an orthopaedist.
9. Despite his difficulties, plaintiff returned to work on December 8, 2000, for a company called Talley Motors Marine, where he worked as a boat mechanic. Plaintiff had previously worked for this employer. Although plaintiff was able to return to work, he was physically unable to do all the jobs of a boat mechanic and could not work full time for Talley Motors Marine. Plaintiff did whatever work Talley Motors Marine had available that he was physically able to perform. Other work was available, but plaintiff was physically unable to perform it. Records of the hours plaintiff worked and the wages he earned were introduced as plaintiff's Exhibits 4 and 5.
10. Although he had returned to work, plaintiff continued to have problems with his back and sought treatment from Northeast Orthopaedics. Plaintiff first saw Dr. Michael Meighen on January 16, 2001. Dr. Meighen started plaintiff on a physical therapy program and restricted his work to no lifting of more than 25 pounds and minimized bending, turning, twisting and rotating. When plaintiff returned to Dr. Meighen on February 14, 2001, Dr. Meighen ordered an MRI of plaintiff's lumbosacral spine. On February 20, 2001, Dr. Meighen elevated plaintiff's lifting restrictions from 25 to 30 pounds. Plaintiff's next MRI showed a disc herniation at L4-5 that was right to paracentral. On March 13, 2001, plaintiff returned to Dr. Meighen. Dr. Meighen recommended an epidural injection and a surgical consult. In the meanwhile, he limited plaintiff's lifting to 25 pounds.
11. Plaintiff saw Dr. Mark Jasmine for a surgical consult on March 27, 2001. Dr. Jasmine noted "a significant disc herniation more to the right than the left at L4-5." Dr. Jasmine recommended an epidural steroid injection. Further, he suggested that surgery was an option.
12. Plaintiff continued to treat with Dr. Meighen for his back injury. Epidural injections and surgery continued to be possible treatment programs for plaintiff. However, plaintiff was reluctant to have these procedures performed. On July 13, 2001, Dr. Meighen released plaintiff at maximum medical improvement. He gave him a permanent partial disability rating of five 5% for his disc herniation at L4-5. Plaintiff was given permanent work restrictions of no lifting over 75 pounds, alternate sitting and standing, minimized prolonged flexed activities and/or positions, and minimized repetitive flexion movements. The Full Commission finds that plaintiff was not at MMI as found by Dr. Meighen, because both surgery and epidural injections remained as viable treatment options. Clearly, Dr. Meighen's rating was a result of plaintiff's being reluctant to undergo further treatment. Once plaintiff undertook that treatment, which was related by the physicians to his injury by accident, a finding of maximum medical improvement was not supported by the evidence.
13. After being released by Dr. Meighen, plaintiff sought a second opinion with Dr. W. Stephen Furr. Dr. Furr diagnosed a severe diffuse disc bulge at L4-5 with a right paracentral disc protrusion. Additionally, he diagnosed a mild diffuse bulge at L3-4 and a tiny central disc protrusion at L5-S1. Dr. Furr recommended an epidural injection. Dr. Furr further opined: "I do believe the herniated disc is from the workers' compensation injury." Plaintiff had an epidural block performed by Dr. Robert Wilson on May 20, 2002. According to Dr. Furr's notes, the epidural only helped for about a week. Dr. Furr recommended a repeat epidural and, if that did not help, referral to a spine surgeon. The second epidural injection was performed on August 5, 2002. After that, Dr. Furr referred plaintiff to Dr. Ranjan Roy for evaluation of his back and right leg radiculopathy.
14. Dr. Roy saw plaintiff on October 16, 2002. He recommended either surgery or continued use of pain medication. Dr. Roy expressed the opinion that plaintiff's symptoms were affecting his quality of life and his job.
15. Dave Reimann testified that he had been the customer service manager at Carolina Crossing Marine since 1992. As such, he was plaintiff's direct supervisor. He agreed that plaintiff's job was physical in nature and required agility and the ability to lift over 75 pounds. Additionally, Dave Reimann stated he would not want to attempt to perform the job of a boat mechanic with a herniated disc in his back. He also acknowledged that plaintiff had not been reprimanded prior to his injury, he had not been given a performance evaluation prior to his injury although one was months past due, and he was not given the time he was promised to correct his alleged deficiencies prior to terminiation.
16. After the hearing before the Deputy Commissioner, the deposition of Paul Schroll was taken. Schroll was a private investigator hired by defendant who obtained video footage of plaintiff playing recreational softball. There was a great deal of testimony concerning the videotape. To summarize, it shows plaintiff playing softball on a couple of occasions. Plaintiff had never denied this activity. The majority of the time plaintiff is depicted on the tape he is simply standing around, either in the infield or in the dugout. The tape does not depict any activity outside plaintiff's restrictions.
17. The deposition testimony of Dr. Michael Meighen, Dr. W. Stephen Furr, Dr. Ranjan Roy, and Dr. Timothy Stackis is summarized as follows:
Dr. Michael Meighen: Dr. Meighen is board certified in physiatry. Dr. Meighen's testimony was as follows:
• Plaintiff had a significant herniated disc at L4-5.
 • Plaintiff's work related injury was the mostly likely cause of this herniation.
 • Plaintiff could develop leg pain or radicular symptoms as a result of this herniation at any time and that these later symptoms would still be as a result of his September 5, 2000 injury.
 • If plaintiff's job was causing problems or difficulties with his back, it would be reasonable to keep him from doing those activities.
 • Playing recreational softball was not outside plaintiff's restrictions.
• Symptoms of a disc herniation can change over time.
Dr. W. Stephen Furr: Dr. Furr is a board certified orthopaedic surgeon. He treated plaintiff after Dr. Meighen's treatment ended. Dr. Furr testified that:
 • Although plaintiff had some underlying degenerative disc disease, the September 5, 2000, injury by accident caused the disc protrusions seen on the MRI.
 • Plaintiff should not engage in the job duties of a boat mechanic if the duties caused him to be symptomatic.
 • Playing recreational softball was not contraindicated given plaintiff's condition.
 Dr. Ranjan Roy: Dr. Roy is a board-certified neurosurgeon who saw plaintiff on referral from Dr. Furr. Dr. Roy testified:
 • Plaintiff had failed at conservative management of his symptoms related to his herniated disc.
 • Prior to surgery, a repeat MRI needed to be performed but the workers' compensation carrier had not approved one.
 • As of the time he saw plaintiff, he would have restricted his activity to lifting no more than 15 to 20 pounds with minimal bending and twisting.
 • Plaintiff's disc herniation at L4-5 was most likely caused by his work-related incident.
 Dr. Timothy Stackis: Dr. Stackis is the chiropractic physician who first treated Plaintiff for his work-related injuries. Dr. Stackis testified that:
 • Plaintiff gave a history to Dr. Stackis of injuring his back while picking up carpet at work.
 • From the initial injury, plaintiff showed signs of radicular pain.
 • From his first visit, Dr. Stackis placed plaintiff on restrictions that included no repetitive bending or flexion.
18. On cross examination by defendants, Dr. Roy, who was unaware that plaintiff had been playing softball while under treatment, was asked:
 Q. If [plaintiff] had informed you that he was in the middle of softball season, that he was playing third base and, you know, he was swinging and things of that nature, running, would that have affected any of your recommendations at all?
And he responded:
 A. Only in that, if he was pain-free, I wouldn't operate on him. But he has an underlying problem, and radiculopathies are not something that's constant. So, if they're feeling better, they can return to their physical activities, including softball, etcetera, but there are potential risks. Any of those maneuvers could reinitiate pain, perhaps even worse than it was before, and associated weakness in the leg, which he didn't have when I first examined him. So playing softball, again, you know, I don't think it's a safe thing to do. But, as I said earlier, it can wane . . . wax and wane, so I guess he could, you know, play.
19. There was no evidence that plaintiff was playing softball pain free. In fact, the evidence was on the contrary. Plaintiff's level of play was substantially worse since his injury. He had trouble hitting balls and his batting average dropped twenty-five to thirty percent after his injury. Several times a day plaintiff had pain that shot down his leg in the back of his calf and ankle. Concerning this pain, plaintiff said "in the last year and a half it hasn't changed any at all, except for when I was on heavy medication." Further, there is no medical evidence to suggest plaintiff was "pain free." Throughout the records of Dr. Michael Meighen, plaintiff complained of low back pain. In his first visit with Dr. Furr, plaintiff presented with low back pain on his right side that radiated down his left leg, occurring in the lateral side and ending just proximal to his right knee. Later, plaintiff described his pain to Dr. Furr as a "stabbing and dull kind of pain." Dr. Furr's records were replete with references to pain. In his last visit with Dr. Robert Wilson for an epidural, plaintiff's chief complaint was "low back pain and right leg pain." He described his pain as ranging from 1 to 8 on a scale of 10. Dr. Wilson recorded a description of plaintiff's pain as "a dull ache, sharp, stabbing type pain." Obviously, plaintiff reported pain or there would have been no need for an epidural. When plaintiff saw Dr. Roy, Dr. Roy recorded "low back pain with radiation into the right leg." Dr. Roy noted that plaintiff's symptoms were affecting the quality of his life and his job.
20. Plaintiff's average weekly wage was $811.64, yielding a compensation rate of $541.10.
21. Because of his compensable back injury, plaintiff was unable to earn any wages from October 10, 2000, until December 8, 2000, when he found work with Talley Motors Marine. However, because of his compensable injuries, plaintiff has not been able to earn an amount at Talley Motors Marine equal to what he was earning at the time of his back injury. Plaintiff works 2 to 2.5 days per week on average for Talley Motors Marine. After a full day's work, plaintiff would be in pain and would usually have to take the next day off. Because of his restrictions and the condition of his back, plaintiff could not perform work that was otherwise available for him to do. While there was more work available at Talley Motors Marine, there was not enough work that he could physically perform.
22. Treatment by all medical providers set forth in this Opinion and Award was reasonably necessary to effect a cure, reduce the period of disability and/or relieve pain.
23. As of the date of the hearing before the Deputy Commissioner, plaintiff had not reached maximum medical improvement and was still in need of medical care as a result of his compensable injury.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reaches the following additional:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer on September 5, 2000. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's firing on October 10, 2000, was a direct result of his compensable injury. Additionally, plaintiff proved that he had lost wage-earning capacity. In Seagraves v. The Austin Company of Greensboro,123 N.C. App. 228, 472 S.E.2d 397 (1996), the court said:
 [T]he employer must first show that the employee was terminated for misconduct or fault, unrelated to the compensable injury, for which a non-disabled employee would ordinarily have been terminated. If the employer makes such a showing, the employee's misconduct will be deemed to constitute a constructive refusal to perform the work provided and consequent forfeiture of benefits for lost earnings, unless the employee is then able to show that his or her inability to find or hold other employment of any kind, or other employment at a wage comparable to that earned prior to the injury, is due to the work-related disability. The application of this rule will, we believe, best achieve fairness to all parties by assuring that an injured employee is awarded benefits for wage loss which is clearly attributable to his or her job-related disability, while protecting employers from liability to employees who engage in intentional, unacceptable conduct while employed in rehabilitative or light duty settings.
Id. 123 N.C. App. At 233-234, 472 S.E.2d. at 401.
3. Plaintiff is entitled to temporary total disability compensation from October 10, 2000, through December 7, 2000, at the rate of $541.10 per week. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to wage loss compensation in any week during the 300 weeks beginning September 5, 2000, in which his average weekly wage is less than $811.64 by reason of his compensable injuries. N.C. Gen. Stat. § 97-30.
5. Plaintiff is entitled to medical compensation to the extent that treatment is reasonably calculated to effect a cure, reduce the period of disability or provide relief. N.C. Gen. Stat. §97-25, as limited by § 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff temporary total disability compensation at a rate of $541.10 per week from October 10, 2000, through December 7, 2000. Said amount shall be paid in a lump sum subject to an attorney's fee approved in Paragraph 4 and shall bear interest at 8 percent per year from October 21, 2002.
2. Defendants shall pay all medical expenses resulting from plaintiff's compensable injury by accident on September 5, 2000, in accordance with N.C. Gen. Stat. § 97-25. This shall include, but is not limited to, treatment by Stackis Chiropractic Clinic; Michael Meighen, M.D.; Stephen Furr, M.D.; Robert Wilson, M.D.; and Ranjan Shanti Roy, M.D.
3. For each week during the 300-week period starting September 5, 2000, in which plaintiff was or continues to be unable to earn $811.64 by reason of his compensable injuries, defendants shall pay to plaintiff 2/3 of the difference between the wages he earns and $811.64.
4. A reasonable attorney's fee of 25% of compensation due plaintiff under Paragraphs 1 and 3 of this AWARD is approved for plaintiff's counsel and shall be paid by defendants as follows: 25% of the amounts due plaintiff under Paragraphs 1 and 3 of this AWARD shall be deducted from such amounts and shall be paid directly to plaintiff's counsel at the same time such amounts are due to be paid to plaintiff.
5. Defendants shall pay the costs.
This 6th day of October 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ____________________ CHRISTOPHER SCOTT COMMISSIONER
S/ ____________________ PAMELA T. YOUNG COMMISSIONER